Number 181686, DexCom, Inc. v. AgaMatrix, Inc. Good morning. Well, just hold on one moment. Okay. All right. Is your name pronounced D? Yes, Your Honor. Sona D. for DexCom. Good morning. May it please the Court. The error underlying the judgment in this case is rooted in claim construction, starting with the term bias potential setting. The ordinary meaning of bias potential setting is a setting of bias potential, and the parties here agree that bias potential is the voltage difference between two electrodes in a circuit. Just like a thermostat setting is a temperature setting, a bias potential setting is that voltage difference setting. Let me understand this. With respect to the two tests here, which are alleged to infringe the method, correct? Correct. One is the track resistance test, and the other one is the abnormal trace test, right? Yes, Your Honor. With respect to the first of those, how is it that the test derives an analyte concentration? I'm not seeing that that's the case. In the track resistance test, there is a signal taken from the first potential setting, a signal taken from the second potential setting, and then they're compared to see if there is enough of an interference in those signals to either move forward and determine analyte or not. Right, but I don't see that that's determining an analyte concentration. The two signals that are used in that test do not themselves determine analyte concentration, but the claim as written uses the deriving step to mean something different than determining analyte concentration. It basically says you derive analyte concentration by using those two signals, and then you move forward to actually determine analyte concentration. Even if it's just a preliminary step, it's deriving analyte concentration? It's using the signal outputs to determine whether there's enough interference. When you look at deriving in the context of the rest of the steps in the claim, those two signals are being used in order to figure out if there is a tolerable level of interference in order to move forward with determining analyte concentration. I understand your point about that. How about the abnormal trace test, where it seems to me that what the district court said here is that there's no infringement by the abnormal trace test because at the second stage here you're not using the data entirely from the second stage, correct? That's what he ruled. Yes, that was the premise of the district court's decision on the abnormal trace test. Why is he wrong about that? The reason that the district court is wrong on that point is that in the abnormal trace test we're dealing with curves that are measured at each of the potential settings and taking information from both those curves. In the abnormal trace test, in the comparing step, the curve that gives us the second signal output trace, information from that curve is being used in order to figure out if there is an interference. Correct, but it's not the only information. Not the only information. Because this is a comprising claim, there's nothing in the intrinsic record that forecloses one from using additional information along with the second output signal information. That doesn't erase infringement. That second output information still dictates the outcome of the comparing step and the differential measurement that is in that step. But for that second output signal, you wouldn't know if you're passing or failing in order to move forward with analyte concentration. Okay, I understand. Thank you. Okay. I want to go back to biased potential setting, if I may, to make a few points on that in terms of the intrinsic record, because that is a key component of both tests that are being accused here. The intrinsic record shows that persons of skill and the art understood biased potential settings could be achieved with either open circuits or closed circuits. Both those circuits are reflected and recognized in the intrinsic record, and we see that in references such as Genshaw that were cited during prosecution and therefore part of the intrinsic record, where Genshaw recognizes that one can switch a biased potential setting to an open circuit potential setting. The district court erred on that preliminary claim construction, even at the Markman stage, by deviating from ordinary meaning and limiting the term to closed circuits and to the application of a set voltage. And nothing in this particular intrinsic record redefines biased potential setting away from ordinary meaning. So the two ways that we see in the case law that a spec can do that, a specification could do that, are disclaimer and lexicography. Those are classic. Agamatrix admitted during the Markman proceedings at the hearing that there's no disclaimer of open circuits. So that leaves Agamatrix with lexicography, and that's what they're arguing here on this appeal. And that resort to lexicography in order to read in... It's also a question of what's meant by an open circuit and a closed circuit. You're also arguing that there is in fact here not an open circuit because some current is flowing, right? Correct. Both sides' experts agree that in the accused devices, the circuit is absolutely closed. There's no dispute of fact even between the experts on that. And so the fact that Agamatrix has a closed circuit... Can you measure voltage if there's no current? You can measure voltage in an open circuit when there's no current flow because that is potentiometry. That is a well-known method of measuring voltage from an open circuit even when there's no current flow through the circuit as a whole. The problem with Agamatrix's lexicography argument is that it takes the definition of bias potential from the specification of the patent in suit and clip quotes a single line that talks about the voltage difference in a circuit when there is a current flow. If you take that definition, we have to look at the definition as a whole. We can't just take a line and there's no cases from this court that allows one to take a single line from a definition and ignore the rest of the definition in the specification. That definition confirms that the bias potential and its setting is used in its ordinary sense and the line that Agamatrix clip quotes out is not limiting. It's including without limitation. If the patentee wanted to limit the bias potential setting to closed circuits, it would not have used that language that says you're supposed to use this in the broader ordinary sense which is in addition to what Agamatrix says is just closed circuits. I bring this up because it shows us that the district court's importation of a closed circuit limitation from an embodiment, a figure one embodiment in the specification which the district court itself recognized was an example is wrong as a matter of claim construction and as a matter of science. Likewise, the district court's importation of applying a set voltage application is also wrong and unnecessary. If that's supposed to reflect a setting, having gone through this briefing, it seems that a setting is something that's readily understood by a jury and we can just call this a voltage difference setting. The problem is that Agamatrix is also arguing that this further requires applying a voltage to both electrodes but that is not necessary to have a bias potential setting. You can have an open circuit. You can have a voltage applied to both electrodes of course or you can have a voltage applied to one electrode in a closed circuit that drives the voltage of the other electrode to be exactly the same. That's a zero bias potential setting which is what the accused devices have. So because the claim construction was erroneous on bias potential setting, that infected the entire summary judgment decision on that term and the summary judgment on that term is also erroneous. Even under the incorrect claim construction that the district court did which was more limiting based on embodiment, the district court didn't apply its own claim construction. To your point, Your Honor, the question of is there circuit acting like an open circuit, the answer is that it is a closed circuit and during the claim construction proceedings, the district court focused on whether a circuit is open versus closed based on whether current can flow or can't flow through it. Their closed circuit does allow some amount of current flow and the district court nevertheless let them escape on summary judgment on this term by not applying his own claim construction that included such closed circuits within the scope of the claims terms. The district court also... Is the current flow part of their measurement process? Yes, the way they have designed their closed circuit, they rely... In the second stage? Yes, in the second stage. There's no dispute as to the first stage. They agree that the first stage is a biased potential setting. So in the second stage, their scientists and their documents show that by design, they have created a biased potential setting that drives to a zero volt potential difference. That's their setting. And their scientists have said, we rely on that current flow, the small amount of current flow that goes through our circuit. That's necessary the way we've designed our devices in order for us to be able to measure the signal output at that setting. So in terms of current flow and it being necessary to measurement, that's an extra step that's not required by the district court's claim construction. But even if it were, their devices would meet that particular requirement. You want to stay the rest of your time? Yes, please. Thank you. Mr. Aldrich? Your Honor, my name is Nika Aldrich. I'm an attorney at Schwab v. Williamson & Wyatt representing AgriMatrix in this case. The district court here granted summary judgment. Could you address the point about the abnormal trace test? And the argument, as I understand it, is that there is no infringement here because it doesn't use just second stage data for the determination that it uses additional data and they say that that's permissible under a comprising construction. Could you address that? Help me understand that. The comprising limitation at the top of the claim in the preamble doesn't suddenly defeat the fact that each limitation has to at least be satisfied. Each limitation here... Okay, so why does this limitation preclude the use of additional data? The step requires that the same first signal output and the same second signal output that are used with respect to limitation 4 are used with respect to limitation 5. And they haven't been able to identify a signal output that is used both in limitation 4 and in limitation 5. In limitation 4, they're saying the signal output is... I mean, the brief sort of mixes up, again, different signal outputs, but they're saying for purposes of limitation 4, we're going to rely on the entire trace of current and the entire trace of voltage. Okay, that's fine. So you can have a signal output be the entire trace for both current and voltage, but then when you get to step 5, you have to compare those. Or you have to derive a signal output, or you have to derive an analyte concentration from those. So it's not so much that there's additional data here, but that the comparison is different? There's no comparison, first of all, of the entire signal trace versus the entire voltage trace. And then there's no derivation based on the entire current trace versus the entire voltage trace. In fact, in the reply brief, they do this chart where they try to say that they're relying on the same signal outputs on page 30 and 31, I believe it is. But even on the top of page 30, they're saying, well, it's not actually the signal output, it's a signal output attribute. And there are two different ones that they identify, G and IT peak. And by the time they get over to page 31, they're relying on different values altogether. So it's not a matter that the process can involve other steps, but it at least has to satisfy the steps that are here. And they have to identify which signal output is going to satisfy both steps 4 and steps 5 in the claim, and they've been unable to do that altogether. Does that answer Your Honor's question? Go ahead. Thank you, Your Honor. So the district court here granted summary judgment for six different reasons, and this court need not visit them all. It can affirm based on two issues. First of all, that track resistance test does not practice the deriving limitation, as Your Honor already addressed. And second, that the abnormal trace test, DEXCOM, has failed to identify two signal outputs that are used both in the deriving and the differential measurement limitations. Now, with respect to the track resistance test, the claim recites deriving an analyte concentration from the signal outputs to determine an analyte concentration. The court held that this means that the analyte concentration must be drawn from or obtained from the first and second signal outputs. Simply using the signal outputs to determine a threshold, but then actually calculating the analyte concentration from other values, does not derive the analyte concentration from those signal outputs. Certainly, it doesn't derive an analyte concentration to determine an analyte concentration from those signal outputs. DEXCOM must concede that under the court's construction, the finding of non-infringement is correct. The court gave the term deriving its plain and ordinary meaning. It referred to a dictionary, after all, to understand what the plain and ordinary meaning was. Moreover, the whole purpose of the patent is to calculate, this is from the abstract, it's to calculate substantially interference-free analyte measurements by taking multiple signal outputs. The formulas in the patent show that the calculation requires using first and second signal outputs so that the signal is derived from these values. There is no lexicography that would broaden this plain and ordinary definition. The patent never uses the word deriving in relation to the sole embodiment that DEXCOM relies on. DEXCOM argues that deriving must mean something different from calculating, but the terms throughout the patent are used differently from each other. As used in the patent, the word calculating is always used with respect to the differential measurement. It's always calculating from the differential measurement, whereas deriving is always used with respect to the first and second signal outputs, probably because the process has to go through an additional calculation before actually getting to the final calculation when the deriving step is used. But the glucose concentration in all events is still drawn from the first and second signal outputs as the plain and ordinary meaning requires. As far as the abnormal trace test, we've touched on that a little bit already, but the patents require that the first and second signal outputs are used to determine a differential measurement and then deriving a glucose concentration from the first and second signal outputs. Differential measurement is defined in the patent. It's used in its plain and ordinary sense, which is, quote, the difference between multiple signal output measurements. DEXCOM's shifting arguments throughout this case continually try to recast what the first and second signal outputs are in order to mask the fact that it cannot rely on the same identified values for steps four and steps five in the patent. In its reply brief, as I said, it tries to chart out the claims at the tops of page 30 and 31 and still can't rely on or identify a single signal output that it's relying on for step four and step five. In fact, between those two pages, it has identified eight different values that it wants to, at various points, say are either the first or the signal output or both. And curiously, by the time it gets to the bottom of its charting on page 31, it has decided to simply drop all of the square root symbols from its formulas. Moreover, as the court already addressed, two of the values that it relies on are not measured signal outputs at all. They're actually calculated signal outputs, so they can't qualify signal outputs under the patent because the patent requires that they be measured signal outputs, and what they're relying on are calculated values. And in any event, it's undisputed that at least one of those values requires measurements taken at two different times. It's not even a measurement. Again, it's a calculated value. So it can't be a second signal output at a second bias potential setting. For that reason, the court should affirm the ruling as to the abnormal trace step. Now, as far as bias potential is concerned, this term has a plain and ordinary meaning in the art, and that was clear to the court. A bias potential in the field of electrochemistry is what happens when you take two electrodes and you apply a voltage difference between them in a circuit. Circuit has to involve putting them in a solution of some form where electrochemistry can occur. And the patent states that the term has its plain and ordinary meaning. And the DEXCOM continually relies here on a separate circuit to complete its argument. So what happens in our product is the two electrodes are put in a solution in a circuit, and the voltage is applied to both of them, and that generates the electrochemical reaction. Then the circuit is opened, and one of the electrodes is connected to a measurement circuit. It's a separate circuit. And that measurement circuit measures the rate at which the voltage drops off of that electrode. That electrode is no longer in a biased circuit with the first electrode. And they continually say, well, you're still applying a voltage to the first electrode, and now you have the second electrode in its own circuit, therefore they are in a circuit, right? No, they're not in a circuit. They are in two isolated and discrete and separate circuits at that point. And merely the fact that there's a trickle current passing through this measurement circuit doesn't mean that you have both electrodes in a given circuit with a voltage difference being applied to each of those electrodes. In fact, the voltage has been entirely removed from one of the electrodes, such that there's no longer a difference that is actually applied to both of the electrodes. And that's a fundamental requirement. The judge noted that throughout the patent, and all of the prior art that they relied upon, a biased potential is applied. It is a voltage difference that is applied to two electrodes. And as soon as you take away the biased potential from one of them and connect it to something else, you're only applying a voltage to one electrode. It's like, as my expert has repeatedly told me, it's like the sound of one hand clapping. You can't have a difference applied to two things if one of them is disconnected altogether. And so the arguments that Dexcom raised through the district court proceedings are relying on trying to mix together and confuse the fact that one of these electrodes is removed and connected to a different circuit. And they're relying on what happens in that circuit to try to argue that these two electrodes are in a circuit together. They simply aren't. And the judge was able to cut through these arguments and realize what was actually happening here in both the Markman decision, where he said, look, they have to be in a closed circuit and that biased potential has to be applied. But I don't think they're in the same circuit at all at that point. The voltage is applied to one. That circuit is cut with respect to the other. But the circuitry exists, but it's been cut, so there's no juice going to one side. Well, there's no juice going to that side. They're relying on the fact that that electrode is then connected to a measurement circuit that can measure the rate at which the voltage drains off of that electrode. So they're saying, well, it's in a circuit, but it's not the same circuit as the first electrode at that point. It's in a different circuit. And so the judge, as I said, cut through this, figured out during Markman exactly what the arguments were that the parties were raising, and then applied his very rational and well-thought-out and very well-explored Markman decision in the merits decision at summary judgment. Again, the court doesn't have to get there because I think, frankly, we went on the deriving step and on the abnormal trace, the fact that they're not relying on the same signal values through each step in that claim. But to the extent the court wants to broach the bias potential issue, that's really what's going on there. I'm happy to yield the rest of my time unless the panel has any questions. Okay. Thank you. Thank you, Your Honors. Thank you, Your Honors. I want to address the abnormal trace test that counsel talked about during his argument. With respect to the signal output and the information that's coming from the signal outputs, the patent itself recognizes that you can have signal outputs as entire curves with multiple pieces of data, and that you can then take certain pieces of information from those signal outputs. We see that in the patent at column 10, where the patent says you can have a curve and you can take information such as the magnitude of the curve, which is peak to trough, or you can take information such as rate from a curve, which is the slope, and use that information. That is exactly what's going on in the abnormal trace test. There are two signal outputs in the two bias potential settings. For our first signal output value that's being used in the comparing step, we rely on the peak of that first signal, IT peak. The second signal output that we take from the second curve is a variable called VT mobility. We take that, and then we use both that information and process the VT mobility output signal into a formula, which the patent recognizes broadly formulas can be used, equations can be used in the process of comparing. There's nothing that stops that when the patent itself recognizes that you can look at the rate of a curve or magnitude of a curve before you get to the comparison step. When counsel says we haven't shown that you're comparing one entire curve to another entire curve, the patent doesn't even require that. It actually contemplates taking information from both curves and comparing them. That's what their devices do. They then take that VT mob and plug it into a formula in order to compare against IT peak, figure out the differential, and figure out whether they can move forward. We are using the same two signal output curves. There's nothing that forecloses us in the patent or the intrinsic record or the language of the claim from using different pieces of information in order to meet those steps, and our experts have consistently done so. With respect to the track resistance test, one of the things that counsel for Agamatrix said is that the district court's claim construction was based on plain meaning of deriving, and he took it from a Webster's dictionary that's not in the record. The problem is that the district court took the approach that Phillips actually admonishes against, which is starting with a dictionary and ending with the dictionary. Because what happened here is in the process the district court overlooked embodiments that do not require calculating glucose directly from signal outputs. But that's the way both the district court and Agamatrix is arguing deriving should be interpreted, and that doesn't make sense because there are embodiments in the patent that do not require a calculation. The best way to see that is claim differentiation. Claim 53, which is the asserted independent claim in this particular case, has a deriving step. Claim 51 is essentially the same claim. All the steps line up except the deriving step is substituted with a calculating step. Thank you. I thank both counsel. The case is submitted.